**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CHRISTINA R. THOMPSON, | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | Civil No. 25-3347-BAH |
| PEAK MANAGEMENT, LLC, | * | |
| Defendant. | * | |

* * * * * * * * * * * * * *

## MEMORANDUM OPINION

Plaintiff Christina R. Thompson ("Thompson") originally brought this putative class action against Defendant Peak Management, LLC ("Peak") in the Circuit Court for Baltimore County, alleging that Peak has violated the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law § 14-201 et seq., on account of their operation as an unlicensed consumer collection agency. ECF 1 (notice of removal); ECF 17 (second amended complaint). Pending before the Court is Thompson's motion to remand, ECF 7 (motion); ECF 8 (supplement), to which Peak has filed an opposition, ECF 11, and Thompson has filed a reply, ECF 12. After the motion to remand became ripe, Thompson filed a second amended complaint.[1] ECF 17. Peak has moved to dismiss that complaint.[2] ECF 18. Thompson has filed a response in opposition to dismissal,

[1] The original complaint is docketed at ECF 4, and the first amended complaint is docketed at ECF 13. The first amended complaint included three exhibits, ECF 9-1 (rental agreement); ECF 9-2 (management agreement); ECF 9-3 (security deposit statement), and it was filed after the motion to remand ripened. The parties stipulated to Thompson filing a second amended complaint shortly after the first amended complaint was filed. *See* ECF 15.

[2] Peak had also filed a motion to dismiss the original complaint. ECF 9. In light of the subsequent amended complaints and new motion to dismiss filed, the Court will deny that motion as moot.

ECF 21, along with a supplement, ECF 22, and Peak has filed a reply, ECF 25. The parties have also filed several notices of supplemental authority since the motion to dismiss ripened. *See* ECF 29 (notice by Peak); ECF 30 (response by Thompson); ECF 31 (notice by Peak); ECF 32 (response by Thompson); ECF 33 (notice by Peak). All filings include memoranda of law, and some include exhibits.[3] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Peak's first motion to dismiss is **DENIED AS MOOT**, and Thompson's motion to remand is **GRANTED**. The Court will not address Peak's live motion to dismiss, ECF 18, which should be adjudicated in state court.

## I. BACKGROUND

Thompson's putative class action is brought against Peak for its alleged "uniform and systemic violation[s]" of the MCDCA, which Thompson alleges "are per se violations of the Maryland Consumer Protection Act ('MCPA')." ECF 17, at 1. "Peak was the property manager for [t]he Hampton Manor Apartments, an apartment complex allegedly owned by Hampton Manor Apartments LLC" and located in Cockeysville, Maryland. *Id.* at 3 ¶ 7, at 10 ¶ 65. Peak was "hired to collect rent and deposit it for the owner pursuant to the terms of [a] Management Agreement with the Owner Hampton Manor Apartments LLC to collect and receive payments." *Id.* at 3 ¶ 8. Peak "engages in collection activities by directly or indirectly using the legal processes in the State of Maryland, including but not limited to" the filing of lawsuits in Maryland courts. *Id.* at 4 ¶ 17. "Peak is paid fees or other compensation for its collection efforts on behalf of the owners of apartment complexes it manages." *Id.* ¶ 14. "The Management [Agreement] states that Peak is to receive 5% of all income it collects." *Id.*

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

Thompson alleges "that in the 3 years preceding the initial filing of this action, while knowingly lacking a Maryland mandated consumer collection agency license," Peak "illegally threatened to sue, supported collection suits, [and] collected payments from tens if not hundreds of current and former consumer residential tenants on behalf of others." *Id.* at 1 ¶ 1. Thompson avers that Peak sought to "enforce illegal lease provisions," such as certain "late fee provisions," "collecting amounts it knew that it did not have the right to collect from tenants." *Id.* at 1–2 ¶ 1. For these alleged violations, Thompson asserts that she and the proposed class are entitled "to a return of all amounts paid to Defendant for others and for a return of all late fees, costs, including attorney fees, interest or other charges illegally collected" during the relevant time period. *Id.* at 3 ¶ 3.

Thompson entered a lease to live at the Hampton Manor Apartments "effective February 1, 2018 for a thirteen-month term to end on February 28, 201[9]."[4] *Id.* at 11 ¶ 67. She believes that her lease "was a lease form regularly presented and enforced by Defendant to her and the members of a proposed class." *Id.* "Thompson moved out of the apartment before the lease ended, while her roommates remained living there." *Id.* ¶ 68. "Hampton Manor Apartments in care of Peak Management filed suit against Thompson for back rent in June, 2024" in the District Court of Maryland, sitting in Baltimore County. *Id.* ¶ 69. "The claim included amounts for attorney fees, late fees and other charges." *Id.* ¶ 70. Peak "applied a security deposit against the various charges for late fees, attorneys fees and rent alleged to be due" and then demanded the remaining balance in the lawsuit. *Id.* ¶ 71. "At trial for that suit, the Residential Credit and Collections

[4] The second amended complaint actually alleges that the lease ended on "February 28, 2018." ECF 17, at 11 ¶ 67. The Court assumes this must be an error, given that otherwise Thompson's lease would have only lasted for 27 days. *See* ECF 9-1 (rental agreement attached to first amended complaint identifying "2/28/2019" as "Lease End Date").

Manager for Peak Management testified[.]" *Id.* ¶ 72. "When Peak Management collected, directly or indirectly, from Thompson" as her landlord's "agent," Thompson claims "Peak Management did not have a license as a Collection Agency as required under Maryland law." *Id.* ¶ 73.

In light of these allegations, Thompson asserts four counts against Peak in the second amended complaint. Count I alleges that Peak violated the MCDCPA and the MCPA by engaging "in the business of collecting consumer debts by making demands for payments from Plaintiff and others for rent, utilities, services, late fees, attorneys fees or other illegal fees, including collecting amounts and/or seeking evictions through Collection Actions it caused to be filed against the Plaintiff and others, when it was not licensed to act as a collection agency." *Id.* at 17 ¶ 113. Count II alleges that Peak violated § 8-208 of the Real Property Article of the Maryland Code by seeking to enforce an illegal late fee provision, a provision which allegedly constitutes "a waiver of a tenant's rights under applicable law." *Id.* at 19 ¶ 123. Count III alleges that Peak "has collected late fees" and "attorneys fees or other charges" based on "a lease provision that is unenforceable under Maryland law" in violation of the MCDCPA and the MCPA. *Id.* at 20 ¶ 130. Finally, Count IV states a claim for "unjust enrichment/money had and received" on account of the allegation that Peak "was not entitled to receive any benefit or payments . . . through collection activities or Collection Actions it engaged in directly or indirectly because it did not have the legal right to engage in debt collection without a collection agency license." *Id.* at 22 ¶ 142.

## II. <u>MOTION TO REMAND</u>

This putative class action involves state law claims asserted against a Maryland defendant.. Nevertheless, Peak removed this action on the grounds that "[t]his Court has subject matter jurisdiction . . . under the Class Action Fairness Act ('CAFA') pursuant to 28 U.S.C. §§ 1332(d) and 1453." ECF 1, at 2 ¶ 6. Thompson moves for remand, arguing that the Court should remand the action pursuant to the mandatory exceptions "under § 1332(d)(4)." ECF 7, at 2. In the

alternative, Thompson requests the "opportunity to conduct jurisdictional discovery" to determine whether the exception applies. *Id.* at 5.

"Congress enacted CAFA in 2005 to expand subject matter jurisdiction in the federal courts over 'interstate' class actions 'of national importance.'" *Dominion Energy, Inc. v. City of Warren Police & Fire Ret. Sys.*, 928 F.3d 325, 329 (4th Cir. 2019) (citation omitted). "CAFA sought to accomplish that purpose by amending the diversity jurisdiction statute, codified in 28 U.S.C. § 1332." *Id.* at 329–30. "A primary justification for diversity jurisdiction in the federal courts under § 1332 — and for expanding such jurisdiction under CAFA in particular — is the prevention of state court 'bias against out-of-State defendants.'" *Id.* at 330 (citation omitted). In light of that justification, "CAFA extended federal jurisdiction to those class action proceedings that satisfy three requirements: (1) the putative class has more than 100 members (numerosity); (2) the amount in controversy exceeds five million dollars, exclusive of interest and costs (amount in controversy); and (3) the parties are minimally diverse in citizenship (minimal diversity)." *Id.* (citing 28 U.S.C. § 1332(d)(2), (5)(B)). "When the foregoing three criteria (i.e., numerosity, amount in controversy, and minimal diversity) are satisfied, a defendant sued in a class action in a state court is presumptively entitled to remove the proceedings to federal court." *Id.* (citing 28 U.S.C. § 1453(b)).

"Where these requirements are met, the district court has 'original jurisdiction' over the action, 28 U.S.C. § 1332(d)(2), unless it 'solely involves' one of three statutorily defined types of claims, *id.* § 1332(d)(9), which are 'generally called the covered security exception, the internal affairs exception, and the securities-related exception." *Skyline Tower Painting, Inc. v. Goldberg*, 148 F.4th 209, 220 (4th Cir. 2025) (quoting *Dominion Energy*, 928 F.3d at 330–31). Here, there appears to be no dispute that the numerosity, amount in controversy, and minimal diversity

requirements are satisfied and that none of the exceptions in § 1332(d)(9) apply. *See* ECF 11, at 2.

"Even where a district court has original jurisdiction pursuant to CAFA, however, it can—or must—abstain from exercising that jurisdiction in certain circumstances." *Skyline Tower Painting*, 148 F.4th at 220 (collecting cases). "Section 1332(d)(3) provides the circumstance when a district court *may* decline to exercise CAFA jurisdiction, which is known as the 'discretionary exception.'" *Id.* at 221 (emphasis in original) (quoting *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1149 (11th Cir. 2021)). However, "§ 1332(d)(4) provides that '[a] district court *shall* decline to exercise [CAFA] jurisdiction' when one of two exceptions applies." *Id.* (emphasis added by *Skyline Tower Painting*) (quoting 28 U.S.C. § 1332(d)(4)). The first of these mandatory exceptions, located in § 1332(d)(4)(A), is "commonly known as the 'local controversy exception.'" *Id.* (quoting *Quicken Loans Inc. v. Alig*, 737 F.3d 960, 962 (4th Cir. 2013)). The second, in § 1332(d)(4)(B), is known as "the 'home-state exception.'" *Id.* (quoting *Johnson v. Advance Am.*, 549 F.3d 932, 933 (4th Cir. 2008)).

"Under CAFA, the removing party bears the burden of establishing federal jurisdiction over a class action, but the party seeking remand has the burden of proving that one of CAFA's three exceptions to removal applies." *Dominion Energy*, 928 F.3d at 335–36. The Fourth Circuit has held that "the application of a CAFA *exception* under § 1332(d)(3) or (4) is *not* jurisdictional, because it does not defeat the district court's original jurisdiction; rather, it permits or mandates abstention." *Skyline Tower Painting*, 148 F.4th at 222 (emphasis in original). The Fourth Circuit has further held that the party "seeking remand must show that a CAFA exception applies by a preponderance of the evidence." *Id.* at 223. Thompson is that party, and so the burden lies with her. Although Thompson purports to invoke just the local controversy exception in support of

remand, her motion actually argues for remand under *both* mandatory exceptions in § 1332(d)(4). *See* ECF 7, at 2–5. Accordingly, the Court will assess her arguments for remand under both provisions but does so recognizing that the only element that appears to be in dispute is one required by both provisions, namely, that at least two-thirds of the members of the putative class are citizens of the state in which the action was originally filed. *See* 28 U.S.C. § 1332(d)(4)(A), (B); ECF 7; ECF 11; ECF 12.

As to that contested element, Thompson argues that she has carried her burden of showing that it is more likely than not that at least two-thirds of those individuals remained Maryland residents on September 8, 2025, the date her complaint was filed. *See* ECF 7; 28 U.S.C. § 1332(d)(7) ("Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint . . . ."). She first notes that "[t]he proposed class consists of persons who rented an apartment in the State of Maryland." ECF 7, at 4; *see also* ECF 17, at 14 ¶ 97 (defining the class as "[a]ll individuals who are or were a residential tenant with an address in the State of Maryland that Peak Management, LLC acted as the Property Manager [for] in the three years preceding the filing of the Complaint in this action until a class is certified"). Thompson contends that at least two-thirds of the proposed class "are citizens of Maryland based on statistics compiled by the United States Census Bureau [(USCB]," which revealed for "the years 2022-2023" that "96% of Marylanders remained in Maryland in each year." ECF 7, at 4. In support of this contention, Thompson attaches a declaration from Scott C. Borison, her counsel in this matter, containing a table constructed by Borison using official USCB datasets. ECF 8-1, at 2; *see also* ECF 11, at 1. According to Thompson, the data "means even if the less than 4% for each year consisted solely

of class members during the 3-year period preceding the filing of this action, only 8% of the proposed class have left Maryland." ECF 7, at 4.

Peak argues that Thompson "has not presented sufficient evidence of potential class citizenship, as assumptions based on residency or population statistics are insufficient for meeting the burden required in 28 U.S.C. § 1332(d)(4)." ECF 11, at 2. Peak points out that "Plaintiff's argument solely relies on a singular generalized census table that depicts the population of the entire state of Maryland between 2021 and 2023." *Id.* at 3. Peak also argues that the affidavit containing the data contains several issues, including that it "does not provide a citation to where the original chart can be reviewed, and the chart is devoid of any other context provided in the original census report." *Id.* One such missing detail, according to Peak, is whether the chart depicts population numbers for "citizens" or "residents" of Maryland. *Id.* Peak argues that the distinction is critical because a "resident" is not necessarily a "citizen" as that term is used in § 1332(a).

"The citizenship element can be satisfied by definitionally limiting the class to citizens of the state in question." *Skyline Tower Painting*, 148 F.4th at 224. However, the class proposed here is "[a]ll individuals who are or were" residential tenants "with an address in the State of Maryland that Peak Management, LLC acted as the Property Manager [for] in the three years preceding the filing of the Complaint in this action until a class is certified." ECF 17, at 14 ¶ 97. This class is not definitionally limited in a way that would automatically satisfy the first element of the local controversy exception, as "individuals who are *or were*" tenants "with an address in the State of Maryland" are not necessarily citizens of Maryland. *Id.* (emphasis added). The only evidence Thompson has put forth in support of the argument that at least two-thirds of these residential tenants are citizens of Maryland is the declaration of counsel. *See* ECF 8-1, at 2–3.

The Fourth Circuit has recently held that "in the context of CAFA's local-controversy exception, . . . residency suffices to create a rebuttable presumption of citizenship." *Skyline Tower Painting*, 148 F.4th at 225; *see also Fernandes v. D.R. Horton, Inc.*, 777 F. Supp. 3d 533, 543 (D.S.C. 2025) (collecting cases where district courts in the Fourth Circuit had held the residency-domicile presumption applies to determine citizenship of members of a putative class for CAFA exception issues); *Scott*, 865 F.3d at 196 n.6 ("We note that CAFA-exception cases holding that 'a rebuttable presumption that a person's residence is his domicile' are inapplicable to the determination of whether the amount in controversy is met . . . In CAFA-exception cases, the court has necessarily determined that jurisdiction exists and is only considering whether the exceptions impose a limit." (quoting *Mason v. Lockwood, Andrews & Newman, P.C.*, 842 F.3d 383, 390 (6th Cir. 2016))). "[A]s several circuits have emphasized, '[t]he citizenship inquiry under the local controversy exception should not be exceptionally difficult, but instead practical and reasonable.'" *Skyline Tower Painting*, 148 F.4th at 226 (internal citation marks omitted) (quoting *Mason*, 842 F.3d at 392).

Accordingly, "[w]here a plaintiff class presents evidence that a class member is a resident of a given state, it is eminently reasonable for the district court to adopt a rebuttable presumption that the class member is a citizen of that state." *Id.* "Such a presumption does not undermine CAFA's 'goal' of 'keep[ing] *interstate* actions in federal court and truly *intrastate* actions in the state courts.'" *Id.* at 226–27 (quoting *Adams v. W. Marine Prods., Inc.*, 958 F.3d 1216, 1223 (9th Cir. 2020)). However, "residency is weaker evidence of citizenship where a significant percentage of the class can be expected to be only temporary residents—such as where a large number of class members are residents of a university campus, a military base, or an area with many vacation homes." *Id.* at 227–28. "By contrast, property ownership is a 'strong indicator of domicile,' so

defendants faced with evidence that the plaintiff class is largely made up of residents who own their homes will have a more difficult time rebutting the presumption that those residents are citizens." *Id.* at 228.

In *Skyline Tower Painting*, the only evidence before the court in support of the citizenship of the members of the putative class was "two affidavits provided by a paralegal . . . that Plaintiffs attached to their motion to remand and related reply." *Id.* at 224. The paralegal "explained that she used web tools 'to geographically map a 4000-foot radius from the TV Tower' and 'determine the postal addresses for the [2,785] properties located in' that area." *Id.* (citation omitted). "She then used 'the Maryland State Department of Assessments and Taxation's ('SDAT') Real Property Data Search tool' and 'Business Entity Data Search tool' to identify the owners for each property." *Id.* (citation omitted). "She counted individuals as citizens only if they listed a Maryland address as their 'principal residence.'" *Id.* (citation omitted). The paralegal's declaration explained that "2,336 (about 84%)" of owners were Maryland citizens. *Id.* "The district court credited this evidence and thus concluded that Plaintiffs had satisfied their burden to show that more than two-thirds of the members of the proposed class were Maryland citizens." *Id.*

In affirming the lower court, the Fourth Circuit reasoned that under "Maryland's regulations—which SDAT's website cites— the 'principal residence' for these purposes 'is the one dwelling where the homeowner regularly resides and is the location designated by the owner for the legal purposes of voting, obtaining a driver's license, and filing income tax returns.'" *Id.* at 228 (quoting COMAR 18.07.03.01). The Fourth Circuit concluded that "[t]he individual class members are thus residents of Maryland, triggering the rebuttable presumption of citizenship," and because the class definition was confined to "all real property owners," they were also "people who not only have their principal residence within Maryland, but also own property within

Maryland." *Id.* The court concluded that was "more than enough to meet [the p]laintiffs' burden." *Id.* The defendants there offered no contrary evidence, but quibbled with the relevant timeframe for the plaintiffs' search of property information. *Id.* The Fourth Circuit rejected that counterargument, noting that the paralegal had identified when she performed the searches in question, and that the website providing support "need[ed] up-to-date data for purposes such as assessing property taxes." *Id.*

Judge Gallagher recently applied *Skyline Tower Painting* to a case factually analogous to Thompson's. *See Aguilar v. Dreyfuss Mgmt. LLC*, Civ. No. SAG-25-03381, 2026 WL 1214979 (D. Md. May 4, 2026); ECF 26 (Thompson's notice of supplemental authority for *Aguilar*). There, the plaintiff alleged that a management company "(1) collected from or attempted to collect from its residential tenants, such as herself, while lacking the consumer collection agency license required under state law and (2) failed to comply with state and local laws regarding residential leases." *Aguilar*, 2026 WL 1214979, at *1 (citation omitted). The complaint defined the class "as '[a]ll individuals that are or were a residential tenant with an address in the State in Maryland that Dreyfuss Management sought to collect from in the three years preceding the filing of the Complaint in this action until a class is certified.'" *Id.*

The *Aguilar* plaintiff argued for remand under the mandatory exceptions in § 1332(d)(4), in addition to a discretionary exception. *See id.* at *4. "In support of her showing that these exceptions apply, [the plaintiff in *Aguilar*] presented a declaration from her counsel that include[d] data from [USCB] reports regarding annual changes in Maryland's population." *Id.* at *5. The data presented showed "Maryland's population in 2021, 2022, and 2023; the number of those residents who lived at the same residence one year ago; and the number of those residents who lived in Maryland but at a different residence one year ago." *Id.* The declaration also explained

how the *Aguilar* plaintiff's counsel reached its calculations. *Id.* Specifically, counsel had "subtract[ed] from each year's population the respective number of residents who lived in the same residence one year ago and the number who lived in Maryland but at a different residence one year ago." *Id.* The Court observed, however, that "those calculations reflect the number of individuals who moved *into* Maryland in each year, rather than those who moved *out of* Maryland." *Id.* (emphasis in original). Moreover, "the table presented by Plaintiff d[id] not differentiate between homeowners and renters, who tend to be more mobile than homeowners." *Id.*

The property management defendant in *Aguilar* presented purportedly contrary evidence, arguing that another set of USCB tables "show[ed] the number of individuals who moved out of Maryland each year and [] differentiate[d] between homeowners and renters." *Id.* "Specifically," the table showed "Maryland's population one year ago and the number of those residents who moved to a different state," including "sub-values based on renter/homeowner status." *Id.* Considering the defendant's evidence, Judge Gallagher observed that the defendant, in attempting to oppose remand, had actually "presented evidence in support of it." *Id.* By (bravely) doing some of its own math, the Court calculated that approximately 5% to 6% of renters had left Maryland in the relevant years. *See id.* at *6. "Although th[e] data reflect[ed] renters generally," Judge Gallagher "perceive[d] no reason that [the defendant's] renters would be any more likely to leave the state than a renter of any other management company." *Id.* Thus, even assuming that the defendant "gained no new Maryland tenants to replace those who left the state during the class period, if approximately 6% of its tenants left the state during each of the three years of the class period, then approximately 82% of its tenants during the class period likely remained Maryland residents at the time" the complaint had been filed. *Id.* Based on that evidence, Judge Gallagher concluded that the plaintiff had "arguably met her burden of showing that it is more likely than not

that at least two-thirds of the putative class members were Maryland citizens at the time of the filing of the complaint," although Judge Gallagher ultimately rested her decision to remand on the application of the discretionary exception under § 1332(d)(3). *Id.*

Here, Plaintiff's counsel has attached a declaration including a table "based on excerpts of The U.S. Census Bureau's American Community Survey (ACS) 1-Year State-to-State Migration Flows (Table T13) for calendar years 2021, 2022 and 2023."[5] ECF 8-1, at 2 ¶ 2. The Court has reproduced that table here:

| Current residence | Population 1 year and over | | Same house 1 year ago | | Same state of residence 1 year ago | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Estimate | MOE | Estimate | MOE | Estimate | MOE | Year | Left State | percentage |
| Maryland | 6,110,314 | 4,411 | 5,436,497 | 25,521 | 464,671 | 22,354 | 2023 | 209,146 | 0.03422836 |
| Maryland | 6,100,234 | +/- 5,254 | 5,395,850 | +/- 19,513 | 511,449 | +/- 19,836 | 2022 | 192,935 | 0.03162748 |
| Maryland | 6,099,715 | +/- 4,217 | 5,387,234 | +/- 27,596 | 519,574 | +/- 25,291 | 2021 | 192,907 | 0.03162558 |

*Id.* Counsel explains that "[t]he 'Pop' (population) column shows the population of Maryland for each year, the 'Same House' Column shows the number of residents who lived in the same house, [and] the 'Same State' Column shows Residents who moved intrastate." *Id.* Further, "[t]he 'Left State Est.' is the population who do not fall in the 'Same House' or 'Same State' Columns and presumably left the state followed by the percentage of the those who presumabl[y] left to the Population." *Id.* According to counsel, "[n]o year exceeded 4%." *Id.* Counsel avers that "[t]he table was generated from the official Census Bureau datasets cited above," and that "[n]o

[5] It is unclear to the Court why counsel's declaration focuses on data from 2021. The class definition includes those "who are or were a residential tenant with an address in the State of Maryland that Peak Management, LLC acted as the Property Manager [for] *in the three years preceding* the filing of the Complaint in this action until a class is certified." ECF 17, at 14 (emphasis added). The original complaint was filed on September 8, 2025. ECF 1, at 1 ¶ 1; ECF 4, at 1. Three years prior to that date was September 8, 2022. Thus, by definition, the class consists of individuals who resided in Maryland at some point between September 8, 2022 and September 8, 2025.

alterations were made to the data other than adding the Left State that was determined as explained above and computing percentages." *Id.* ¶ 3.

This table appears much like the plaintiff's table in *Aguilar*, which the Court did *not* ultimately rely on. *See* 2026 WL 1214979, at *5. Like Judge Gallagher observed, this table appears to primarily "reflect the number of individuals who moved *into* Maryland in each year, rather than those who moved *out of* Maryland." *Id.* (emphasis in original). Moreover, the table "does not differentiate between homeowners and renters, who tend to be more mobile than homeowners." *Id.* Further, counsel has failed to provide a detailed explanation in his declaration reflecting how he reached these figures. But unlike the *defendant* in *Aguilar*, Peak does not attach contradictory evidence to its opposition. Instead, Peak points out some apparent issues with the declaration, such as the fact that it "does not provide the chart directly from the census report" referenced and "is devoid of any other context provided in the original census report." ECF 11, at 3. Peak likewise notes that "the chart depicts population numbers in Maryland between 2021 and 2023 but does not specify whether the population includes 'citizens' of Maryland or 'residents' of Maryland," and argues that "[i]t is very plausible that there were individuals who maintained only a temporary residence in the apartments and are citizens of another state." *Id.* at 3, 5.

This Court largely agrees with Peak's criticisms counsel's declaration. However, this Court "may take judicial notice *on its own*" of any fact "that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and it can do so "at any stage of the proceeding." Fed. R. Evid. 201(b)–(d) (emphasis added). Accordingly, this Court, as Judge Gallagher did in *Aguilar*, "will take judicial notice of Table B07413, an official government report, for the years 2022, 2023, and

2024."[6] *See* 2026 WL 1214979, at *5; *United States v. Cecil*, 836 F.2d 1431, 1452 (4th Cir. 1988) ("[C]ourts may take judicial notice of official governmental reports and statistics.").[7]

Further, the Court adopts Judge Gallagher's analysis of those tables. "By dividing the 'Householder lived in renter-occupied housing units' under 'Moved to different state' value by the 'Householder lived in renter-occupied housing units' under 'Total living in area 1 year ago' value, . . . approximately 5.4% of renters left in 2022, 5.8% of renters left in 2023, and 4.7% of renters left in 2024." *Aguilar*, 2026 WL 1214979, at *6. Or, applying the margin of error most favorable to Peak "by adding it to the number of renters who moved to a different state and subtracting it from the number of renters residing in the state one year before," "5.9% in 2022, 6.5% in 2023, and 5.2% in 2024." *Id.* Accordingly, even assuming Peak gained no new Maryland tenants to replace those who left the state during the class period, if approximately 6% of its tenants left the state during each of the three years of the class period, then approximately 82% of its tenants during the class period likely remained Maryland residents at the time Thompson's complaint was filed. *See id.*

Peak counters that *Aguilar* has no bearing on this case because "[u]nlike in *Aguilar*, Thompson engaged in affirmative activity in this Court that waived any right to seek remand." ECF 28, at 1. Specifically, Peak points to Thompson's two amendments to her complaint that followed the filing of her motion to remand. *See* ECF 7 (motion to remand filed on October 28,

[6] If the Table B07413 for the year 2025 were available, the Court would take judicial notice of it as well. However, that table does not yet appear to be accessible yet. *See* U.S. Census Bureau, American Community Survey, Table B07413: 2024, Geographical Mobility in the Past Year by Tenure for Residence 1 Year Ago in the United States, *available at* https://data.census.gov/table/ACSDT1Y2024.B07413 (last accessed Aug. 8, 2026).

[7] However, since the opinion in *Aguilar* reproduced the pertinent information from Table B07413 in 2022, 2023, and 2024, the Court will not do so again in this opinion. *See* 2026 WL 1214979, at *5–6.

2025); ECF 13 (first amended complaint filed on November 13, 2025); ECF 17 (second amended complaint filed on December 12, 2025). In support of this argument, Peak cites two cases from this District, both putative class actions. *See* ECF 28, at 1–2. In the first cited case, Judge J. Frederick Motz observed that it is "well-established [that] a plaintiff who 'engages in affirmative activity in federal court typically waives the right to seek remand.'" *In re Mut. Funds Inv. Litig.*, 767 F. Supp. 2d 542, 546 (D. Md. 2011) (quoting *Moffit v. Baltimore Am. Mortg.*, 665 F. Supp. 2d 515, 517 (D. Md. 2009)), *aff'd sub nom. Brockway v. Evergreen Int'l Tr.*, 496 F. App'x 357 (4th Cir. 2012). In that case, Judge Motz observed that even though the plaintiffs had filed a motion to remand, "they spent the next six months actively participating in the MDL settlement in federal court instead of pressing their motion to remand." *Id.* Indeed, the plaintiffs there had gone so far as to consent to an order stating that the Court retained jurisdiction. *See id.* "In light of this prolonged engagement in affirmative activity in federal court," Judge Motz concluded that the plaintiffs had "waived the right to object to the procedural removal defects, if any, that may be present in this case." *Id.* (emphasis added).

In the second case, also authored by Judge Motz, the plaintiffs had amended their claim once in state court but added no class allegations to the amended complaint. *Moffit*, 665 F. Supp. 2d at 516. After some interceding events at the state level, counsel for the plaintiffs sent opposing counsel a draft of a second amended complaint, which the defendants' counsel believed would meet the requirements for the exercise of federal jurisdiction under CAFA. *Id.* Eventually, the case was removed to federal court, and the plaintiffs filed that second amended complaint, followed by the filing a motion to remand. *Id.*

In denying the motion to remand, Judge Motz again observed the general principle of waiver with respect to remand and affirmative activity, and found that the plaintiff's actions fell

"well within the ambit of this principle." *Id.* at 517. Specifically, Judge Motz reasoned "[n]othing could more clearly constitute 'affirmative activity' than the filing of a Second Amended Class Action Complaint *alleging . . . facts that clearly give rise to federal jurisdiction.*" *Id.* (emphasis added). Further, Judge Motz held that "considerations of sound policy dictate that plaintiffs must be deemed to have waived their right to seek a remand," because if the case were remanded and then the plaintiffs filed their proposed second amended complaint in state court, the "defendants could then have filed renewed notices of removal." *Id.*[8]

Here, Thompson has indeed twice amended her putative class action complaint since the removal occurred—once as a matter of right in response to Peak's first motion to dismiss, ECF 13, and shortly thereafter as a result of a stipulation between the parties, ECF 17. Both amendments came *after* Thompson filed her motion to remand, and the amendments have not had the effect of "clearly giv[ing] rise to federal jurisdiction," 665 F. Supp. 2d at 517, unlike in *Moffit*, or of suggesting that both parties believe this Court to have jurisdiction, like in *In re Mutual funds Investment Litigation*, 767 F. Supp. 2d at 546. Indeed, the Court reaches the contrary conclusion, based on the nearly identical class definition alleged in all three complaints and the judicial notice of facts explained above. ECF 4, at 8 ¶ 58; ECF 13, at 14 ¶ 98; ECF 17, at 14 ¶ 97. Moreover, neither case Peak cites dealt with the local controversy or home-state exceptions to CAFA under § 1332(d)(4), both of which *require* this Court to decline to exercise jurisdiction when it is more

---

[8] Judge Motz further explained his policy-based rationale by observing that allowing remand under the circumstances presented would allow the plaintiffs "to manipulate the litigation process [by] depriv[ing] this court of jurisdiction it otherwise would have." *Moffit*, 665 F. Supp. 2d at 517. In fact, the plaintiffs' "motions to remand were not filed until after the Second Amended Class Action Complaints had been filed," and the plaintiffs "would not have been required to file second amended complaints to preserve their right to proceed in this court . . . because the removals were challenged not on the ground that [the] claims were preempted but on the separate and independent ground that defendants had not yet received a 'paper' from which it could be ascertained that the actions had become removable." *Id.*

likely than not that the class action meets the requisite conditions. *See* 28 U.S.C. § 1332(d)(4) ("A district court *shall* decline to exercise jurisdiction under paragraph (2) . . . ." (emphasis added)).

The Court is mindful that the party seeking remand must carry its burden to show that a CAFA exception applies by a preponderance of the evidence. *See Skyline Tower Painting*, 148 F.4th at 221–23. And the Fourth Circuit recently declined to hold that plaintiffs seeking remand under such an exception were entitled "to a burden more lenient than a preponderance," in light of federal courts' obligation "to construe and apply CAFA's grant of federal court jurisdiction broadly, and to apply the three removal exceptions in a narrow fashion." *Id.* at 222 (quoting *Dominion Energy*, 928 F.3d at 336). With those principles in mind, this Court cautions that plaintiffs seeking remand under any of CAFA's exceptions will rarely find success in the form of a judge taking *sua sponte* judicial notice publicly available government data. But this case presents unique circumstances where a factually analogous case from this District containing judicially noticeable facts and a nearly identical proposed class definition confirm by the required standard that at least two-thirds of the putative class members were Maryland citizens at the time the complaint was filed. Accordingly, this case warrants mandatory remand under § 1332(d)(4).

## III. CONCLUSION

For the foregoing reasons, Peak's first motion to dismiss is **DENIED AS MOOT**, and Thompson's motion to remand is **GRANTED**. The case is remanded to the Circuit Court for Baltimore County. The Court will not address Peak's live motion to dismiss, ECF 18, which should be adjudicated in state court.

A separate implementing order will issue.

Dated: August 21, 2026

/s/
Brendan A. Hurson
United States District Judge